1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                            CENTRAL DISTRICT OF CALIFORNIA

10

11   JEAN ROYÈRE SAS, et al.,                    Case No. 2:22-cv-01507 HDV JPR

12                    Plaintiffs,                 **ORDER RE: MOTIONS FOR SUMMARY
                                                  JUDGMENT [76, 77, 85]**
13
     v.
14

15   EDITION MODERN, et al.,

16                    Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Jean Royère was an iconic French furniture designer who has been described as one of the most significant designers of the 20th Century, a "savant of design," a "cultural phenomenon," and a visionary who is celebrated for his use of color, shape, and materials.[1]  Recognizing such renown, Defendant Edition Modern has created a successful business selling furniture "in the style of"[2] Mr. Royère.  Mr. Royère's estate brings this suit for copyright, trademark, and trade dress violations, and presents this Court with the age-old question: is it inspiration or imitation?

The parties raise cross motions for summary judgment.  Plaintiffs seek partial summary judgment on their copyright claims vis-à-vis eight specific works, and Defendants seek partial summary judgment on Plaintiffs' trademark, trade dress, and related claims.  As discussed more thoroughly below, the Court finds that the works at issue are both original and separable under *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 409 (2017), and are therefore protected under the Copyright Act.  The Court concludes that Defendants have infringed on Plaintiffs' copyright, but declines to rule on the request for permanent injunction on this incomplete record.  The Court further finds that Defendants have not met their burden of establishing the absence of a genuine dispute on the remaining trademark and trade dress claims.  The Court therefore grants Plaintiffs' motion, in part, and denies Defendants' motion.

## II.   RELEVANT BACKGROUND

### A.  Factual Background

Born in 1902, Jean Royère designed hundreds of furniture pieces in France from the 1930s to the 1970s.  Second Amended Complaint ("SAC") ¶ 7 [Dkt. No. 55]; Plaintiffs' Response in Support of Statement of Undisputed Facts ("PSUF") ¶ 6 [Dkt. No. 104-1].  In 1972, Mr. Royère emigrated to the United States, where he lived until his death in 1981.  SAC ¶ 7; PSUF ¶ 108.  In a holographic will, he bequeathed his estate to his life partner, Dr. Mihaïlo Dordevic.  PSUF ¶ 109–111.  On June 17, 1981, the Tribunal de Grande Instance de Paris determined that Dr. Dordevic was the

---

[1] Plaintiffs' Response in Support of Statement of Undisputed Facts ¶¶ 1, 3, 4 [Dkt. No. 104-1].

[2] Edition Modern, https://www.editionmodern.com/chandelier.

1    beneficiary of all of Mr. Royère's property rights.  *Id.* ¶ 112.  When Dr. Dordevic passed away, he

2    left his entire estate to his niece, Plaintiff Jelena Markovic.  *Id.* ¶ 113.  In 1992, the Superior Court of

3    the State of California determined that Ms. Markovic was the sole beneficiary of all of

4    Dr. Dordevic's property rights.  *Id.* ¶ 114.  The Tribunal Judiciaire de Paris issued a decision

5    confirming Ms. Markovic's status as the sole legal successor to Dr. Dordevic's property in 2021.  *Id.*

6    ¶ 115.

7           Plaintiff Jean Royère SAS is a France-based business that was granted a license by Plaintiff

8    Markovic to reproduce and distribute reproductions of Mr. Royère's works.  SAC ¶ 1; PSUF ¶ 116.

9    Ms. Markovic has not licensed the Jean Royère name to any other party.  Defendants' Reply in

10   Support of Statement of Uncontroverted Facts ("DSUF") ¶ 29 [Dkt. No. 103-1].  On November 7,

11   2019, Plaintiff Jean Royère SAS filed an application with the United States Patent and Trademark

12   Office to register the word mark JEAN ROYÈRE in international classes 11, 20, and 27, and it was

13   subsequently registered on November 17, 2020 as Registration No. 6197569.  SAC ¶ 21.

14          Defendant Denis de la Mésière is the owner and founder of Defendant Edition Modern, a

15   company that sells furniture inspired by modern French designers, including Mr. Royère, as well as

16   pieces designed by Mr. Mésière.  DSUF ¶¶ 1–2, 4–5.  As early as 2015, Defendant Edition Modern

17   began using the JEAN ROYÈRE mark on invoices and price lists.  *Id.* ¶¶ 17–18.  Since 2015,

18   Defendants have sold furniture pieces that bear the styles of Royère's designs, *id.* ¶¶ 39, 41, 43–48,

19   50, 52, 54, 56, 58, 60, 61, 63–88, and have sold pieces specifically advertised with the JEAN

20   ROYÈRE mark or under the heading "Jean Royère Collection," *id.* ¶¶ 340–349.

21                          **B.  Procedural Background**

22          Plaintiffs sue Defendants for creating, marketing, and selling counterfeit copies of Jean

23   Royère works without consent.  Plaintiffs initiated this action against Defendants on March 4, 2022,

24   and eventually filed a First Amended Complaint.  [Dkt. Nos. 1, 34].  Defendants filed a Motion to

25   Dismiss the First Amended Complaint, which the Court granted, in part, and denied, in part, with

26   leave to amend the complaint.  [Dkt. Nos. 36, 54].

27          On October 26, 2022, Plaintiffs filed the Second Amended Complaint asserting the following

28   ten claims:  (1) copyright infringement; (2) contributory copyright infringement; (3) vicarious

                                                    3

1  copyright infringement; (4) trademark infringement; (5) contributory trademark infringement;

2  (6) vicarious trademark infringement; (7) trade dress infringement; (8) false designation of origin,

3  15 U.S.C. § 1125; (9) unfair competition, Cal. Bus. & Prof. Code § 17200; and (10) declaratory

4  relief.  SAC at 10–28.  Plaintiffs allege Defendants counterfeited over fifty separate Jean Royère

5  works, and reference in their SAC eight specific designs and trade dress: Liane wall light, Mille

6  Pattes standing lamp, Ours Polaire (Polar Bear) armchair, Ours Polaire (Polar Bear) sofa, Yo-Yo bar

7  stool, Bouquet chandelier, Coeur floor lamp, and Val d'Or coffee table.  *Id.* ¶¶ 41, 86; Exhibit 1.

8  They seek an order enjoining Defendants from manufacturing, marketing, or selling products that

9  copy Mr. Royère's works, among other forms of compensatory, declarative, and injunctive relief.

10  *Id.*, Prayer for Relief ¶¶ 1–15.

11         On June 23, 2023, Plaintiffs filed a Motion for Partial Summary Judgment ("Plaintiffs'

12  Motion"), seeking a judgment of copyright infringement of the Ours Polaire (Polar Bear) sofa and

13  armchair, Liane wall light, Coeur floor lamp, Oeuf chair, Sculpture chair, Yo-Yo stools, and

14  Éléphanteau chair (hereinafter collectively referred to as the "Works").  [Dkt. No. 76]; *see also*

15  Defendants' Opposition ("Opp.") [Dkt. No. 95]; Plaintiffs' Reply [Dkt. No. 104].  Defendants also

16  filed a Motion for Partial Summary Judgment ("Defendants' Motion"), arguing that Plaintiffs cannot

17  prove their trademark and trade dress claims as a matter of law.  [Dkt. Nos. 77, 85 (under seal)]; *see*

18  *also* Plaintiffs' Opposition ("Opp.") [Dkt. No. 94]; Defendants' Reply [Dkt. No. 103].  The Court

19  heard oral argument on October 19, 2023 and took the Motions under submission.  [Dkt. Nos. 110].

20  **III.    LEGAL STANDARD**

21         Summary judgment should be granted "if the movant shows that there is no genuine dispute

22  as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

23  P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material

24  facts are those that may affect the outcome of the case.  *Nat'l Ass'n of Optometrists & Opticians v.*

25  *Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

26  248 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a

27  verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

28

4

1    The moving party bears the initial burden of establishing the absence of a genuine dispute of

2    material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To carry its burden of production,

3    the moving party must either: (1) produce evidence negating an essential element of the nonmoving

4    party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving

5    party's case.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

6    Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go

7    beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to

8    interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

9    issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*,

10   629 F.3d 966, 973 (9th Cir. 2010) ("Rule 56 requires the parties to set out facts they will be able to

11   prove at trial.").  "In judging evidence at the summary judgment stage, the court does not make

12   credibility determinations or weigh conflicting evidence."  *Soremekun v. Thrifty Payless, Inc.*, 509

13   F.3d 978, 984 (9th Cir. 2007).  "Rather, it draws all inferences in the light most favorable to the

14   nonmoving party."  *Id.*

15   **IV.   DISCUSSION**

16       **A.  Copyright Ownership**

17       Plaintiffs seek a judgment that Defendants are infringing on their copyrights.  To prevail on a

18   claim of copyright infringement, a plaintiff must show (1) that they own a valid copyright in the

19   infringed work and (2) that the defendant copied protected elements of plaintiff's work.  *Feist*

20   *Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

21       The parties disagree about whether Plaintiffs can prove ownership of valid copyrights.  *See*

22   Plaintiffs' Motion at 20–23; Defendants' Opp. at 9–17.  Although a copyright must generally be

23   registered to be eligible for protection under Section 411 of the Copyright Act, foreign works are

24   exempt from this requirement.  17 U.S.C. § 411; *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com,*

25   *LLC*, 139 S. Ct. 881, 891 (2019).  Courts understand foreign works to be those that do not meet the

26   definition of "United States work," as defined by 17 U.S.C. § 101.  *See teamLab Inc. v. Museum of*

27   *Dream Space, LLC*, 650 F. Supp. 3d 934, 945–46 (C.D. Cal. 2023); *Kernal Recs. Oy v. Mosley*, 794

28   F. Supp. 2d 1355, 1359 (S.D. Fla. 2011) ("[I]f AJE does not qualify as a 'United States work,' it is

5

1  exempt from the registration requirement of § 411(a).”), *aff'd sub nom. Kernel Recs. Oy v. Mosley*,

2  694 F.3d 1294 (11th Cir. 2012); *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. 14-cv-

3  02496-BRO-Ex, 2015 WL 12655484, at *4 (C.D. Cal. Nov. 19, 2015) (“[T]he party seeking to

4  protect a [foreign] work must first establish that the subject of copyright is not a United States

5  work.” (citing *Kernal Recs. Oy*, 794 F. Supp. at 1358–59)).

6      Section 101 of the Copyright Act defines a “United States work” as one that is (1) first

7  published in the United States; (2) first published simultaneously in the United States and another

8  country that is party to an international agreement; or (3) unpublished and “all the authors of the

9  work are nationals, domiciliaries, or habitual residents of the United States.”  17 U.S.C. § 101.  A

10  foreign work may be one that is first published outside of the United States, *or* “unpublished” and

11  the works’ author is a national of a country other than the United States.  *Cf. id.*; *see teamLab Inc*,

12  650 F. Supp. 3d at 945–47 (finding the subject works were “unpublished foreign works” and

13  therefore exempt from § 411(a)’s pre-suit registration requirement).  The Copyright Act defines

14  “publication” as “the distribution of copies . . . of a work to the public by sale or other transfer of

15  ownership, or by rental, lease, or lending.”  17 U.S.C. § 101.  Publication may be met through “the

16  offering to distribute copies . . . to a group of persons for purposes of further distribution, public

17  performance, or public display.”  *Id.*; *see also teamLab Inc.*, 650 F. Supp. 3d at 947 (noting that

18  “publication requires commercial exploitation”).  Defendants contend that Plaintiffs must establish

19  the “exact timing” of the first publication, *see* Defendants’ Opp. at 11, but the Court is unpersuaded

20  that the statute or any binding case law impose this requirement.

21      Defendants do not dispute the fact that Mr. Royère was a French national.  *See* PSUF ¶ 108.[3]

22  Instead, Defendants argue that Plaintiffs do not and cannot offer sufficient evidence to establish

23  precisely when and where the asserted works were first published, and that any proof Plaintiffs

24  furnish is inadmissible.  Defendants’ Opp. at 10–16.

25

26

27  ─────────────
    [3] Defendants object to Plaintiffs’ evidentiary support of this fact, however, arguing it is
    unauthenticated and based on hearsay.  *Id.*

28

1   After reviewing the very extensive evidentiary record, however, the Court finds that

2   Plaintiffs have more than sufficiently demonstrated that the Works were first published outside of

3   the United States.  *See, e.g.,* PSUF ¶¶ 37 (referencing 1952, 1954, and 1962 invoices showing sales

4   of the Ours Polaire armchair in France); 55 (referencing a 1962 invoice showing sales of the Liane

5   sculptural wall light in France); 66 (referencing a 1954 invoice for the Oeuf chair in France).

6   Moreover, the Court agrees with Plaintiffs that even if their evidence did not show first publication,

7   the Works may be considered foreign works as unpublished works created by someone who is a

8   national of a country other than the United States.  In contrast, Defendants set forth no evidence to

9   establish that the Works were first published in the United States.[4]  Thus, as foreign works, the

10   Works are eligible for copyright protection under 17 U.S.C. § 411.

11   ### B.  Copyright Protectability

12   Plaintiffs move for summary judgment on the basis that the Works are protectable as

13   copyrights under the Copyright Act of 1976.  Plaintiffs' Motion at 23–31.  Defendants argue that the

14   Works are not entitled to protection because they are neither original nor separable under *Star*

15   *Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 409 (2017).  Defendants' Opp. at 17–27.  For

16   the reasons discussed below, the Court finds that Plaintiffs have met their burden to show the

17   protectability of the Works.

18   ### i.  Originality

19   To qualify for copyright protection, a work must be considered original to the author.  *Feist*

20   *Publications*, 499 U.S. at 345.  In the copyright context, original means that "the work was

21   independently created by the author (as opposed to copied from other works), and that it possesses at

22   least some minimal degree of creativity."  *Id.* (citation omitted).  "[T]he requisite level of creativity

23   is extremely low; even a slight amount will suffice."  *Id.*  So long as a work possesses "some

24   creative spark, no matter how crude, humble or obvious," it will meet the standard for originality.

---

[4] To the extent that Defendants dispute the admissibility of Plaintiffs' evidence offered in support of the present Motions, that argument fails.  The Court has considered Defendants' evidentiary objections and overrules them as discussed more specifically in the Court's December 6, 2023 Order Re: Defendants' Evidentiary Objections [Dkt No. 121].

7

*Id.* (citation omitted).  "Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous."  *Id.*

As to the first element, Plaintiffs' evidence establishes that Jean Royère independently created each of the Works.  PSUF ¶¶ 19–28, 33–40, 48–51; 59–61; 62–66; 73–76; 83–86; 95–98.  Although Defendants argue that Mr. Royère pulled inspiration from other specific designs, *see, e.g.,* Defendants' Opp. at 21, Defendants offer no evidence that the Works were specifically *copied from* other designs.  And whereas Defendants contend that the Works were merely trivial or slight variations of other furniture designs, *see id.*, even that amount of creative spark meets the low level of creativity required to consider the designs original.  *See Feist Publications*, 499 U.S. at 345.  Here it is readily apparent that the Works each have more than the requisite level of creativity to be considered original.  Indeed, Defendant Edition Modern's own price list describes Mr. Royère as having "pioneered an *original* style combining bright colors, organic forms and precious materials."  PSUF ¶ 5 (emphasis added).  To be sure, it is hard to imagine that the Musée des Arts Décoratifs (Museum of Decorative Arts) in Paris would have a permanent exhibition, *see* PR-SUF ¶ 7, dedicated to works that do not have the minimal degree of creativity to be considered original under this test.  The Court finds that the Works are original to Mr. Royère.

### ii.  Separable and Independent Features

Under the Copyright Act, the "design of a useful article" is eligible for copyright protection only if "such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."  17 U.S.C. § 101.  That is the key element that the parties dispute in Plaintiffs' Motion.

"The first requirement—separate identification—is not onerous.  The decisionmaker need only be able to look at the useful article and spot some two- or three-dimensional element that appears to have pictorial, graphic, or sculptural qualities."  *Star Athletica,* 580 U.S. at 414 (citation omitted).  When assessing the second "independent existence" requirement, courts "must determine that the separately identified feature has the capacity to exist apart from the utilitarian aspects of the article."  *Id.*  "If the feature is not capable of existing as a pictorial, graphic, or sculptural work once separated from the useful article, then it was not a pictorial, graphic, or sculptural feature of that

8

article, but rather one of its utilitarian aspects." *Id.*  "The ultimate separability question [] is whether the feature for which copyright protection is claimed would have been eligible for copyright protection as a pictorial, graphic, or sculptural work had it originally been fixed in some tangible medium other than a useful article before being applied to a useful article." *Id.*

The Court finds that the Works each meet this test.  In each of the Works at issue, it does not take much to identify their pictorial, graphic, and sculptural elements.  The soft, bulbous shapes of the Ours Polaire sofa, Ours Polaire armchair, and Sculpture armchair; the vinelike elements of the Liane wall light; the heart and flower shapes of the Coeur floor lamp; the egg-like shape of the Oeuf chair; the rings of the Yo-Yo stool; and the upward cup shapes of the Éléphanteau chair, are all readily separately identifiable.  If these artful aspects are separated from each pieces' utilitarian aspects, they would qualify as "three-dimensional works of . . . art".  *See Star Athletica,* 580 U.S. at 408 (quoting 17 U.S.C. § 101) (finding that the arrangement of graphics on cheerleading uniforms could be separated from the uniform and applied in another medium, such as a painter's canvas, to qualify as works of art).  If the sculptural features of each Work were used in another non-utilitarian medium—if, for example, the Ours Polaire sofa were made of fine glass such that one could not sit on it—they could nonetheless exist as sculptural works of art.  That many of the Works have, in fact, been displayed at art museums confirms this.  *See* PSUF ¶ 7.  And where some original pieces sell at auction for millions of dollars, *see id.* ¶¶ 14 ($3.42 million), 46 (€1.57 million), it may be more appropriate to categorize them primarily as art meant to be appreciated and not touched, rather than "useful articles."  Even so, for our purposes the Works are easily capable of existing independently of their utilitarian aspects, and therefore are eligible for copyright protection.

### C.  Copying

Next, establishing copyright infringement requires proving that original elements of a work were copied.  *Feist Publications*, 499 U.S. at 361.  To do so, a plaintiff must first prove that a defendant copied the work.  *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).  In the absence of direct evidence of copying, "the plaintiff can attempt to prove it circumstantially by showing that the defendant had access to the plaintiff's work and that

the two works share similarities probative of copying." *Id.* (citation omitted).  A plaintiff must then prove "unlawful appropriation," *i.e.* that the works share substantial similarities.  *Id.*

Plaintiffs meet their burden of proof on this issue.  First, Plaintiffs produce sufficient evidence—the underlying facts of which are undisputed—to establish that Defendants copied the Works.  It is undisputed that Defendants use Mr. Royère's original drawings to manufacture some of the Works.  PSUF ¶¶ 175 (the Oeuf chair); 201 (sending the original drawings of the Éléphanteau chair to Defendants Edition Modern's manufacturer and stating, "All measurements are based on original drawings but don't have to be exactly the same.  1/4" difference won't hurt the design.").  Defendants have also represented to clients that they use Jean Royère's original designs when creating their versions of the Works.  *Id.* ¶¶ 139 ("[Edition Modern] make[s] the Polar chairs and sofa from the original template."); 154 (responding to a client inquiry about the Ours Polaire armchair, "We have been making Royère re-editions for many years, we have all of the rights to do so."); 162 ("The Lampshades fabric we use is actually a paper called Manilla Paper.  This is the most standard and close to Jean Royère original designs."); 180 (informing a client that the Sculpture chair "is made from an original template" and responding to another that "re-edition (re-issue) made from the design of Jean Royère"); 188 (responding to a client who asked about the Yo-Yo stools, "This is a reproduction of Jean Royère's original design . . . .").

Second, to prove that that the works share substantial similarities, Plaintiffs must meet a two-part test: "The first part, the extrinsic test, compares the objective similarities of specific expressive elements in the two works." *Skidmore*, 952 F.3d at 1064 (citation omitted).  In this part of the test, courts may only assess "whether the *protectible elements, standing alone*, are substantially similar." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002) (citation omitted).  When objectively comparing works of art, courts consider "the subject matter, shapes, colors, materials, and arrangement of the representations." *Id.* at 826.  "The second part, the intrinsic test, test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." *Skidmore*, 952 F.3d at 1064 (citation omitted); *see Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991) ("The 'intrinsic test'[] focuses on similarity of expression and asks

whether the ordinary reasonable person would find 'the total concept and feel of the works' to be substantially similar." (citation omitted)).

As to the extrinsic test, a comparison of Defendants' works reveals objectively clear similarities in the shapes, colors, materials, and arrangements of elements with each the Works. *See* Plaintiffs' Motion at 8–18.  For example, the original Ours Polaire sofa and Defendants' version are indistinguishable, especially when comparing their exaggerated bulbous shapes. *See id.* at 8.  Like the original Liane wall lamp, Defendants' version uses five wavy black metal branches to hold five ivory shades, all arranged in the same formation. *See id.* at 12.  The curved "ears" and arms of the Defendants' version of the Éléphanteau chair, its upwardly curved bottom, and its conical legs are also all similar to those in Mr. Royère's original version. *See id.* at 18.  And as to the intrinsic test, the Defendants' works are conceptually similar to the Works "from the standpoint of the ordinary reasonable observer."  This is presumably by design, as Defendants market their versions as being "in the style of" Jean Royère designs.

In summary, Plaintiffs have carried their burden of establishing the absence of a genuine dispute that Defendants copied the Works.  The Court finds that Defendants infringed Plaintiffs' copyrights.

### D.  Permanent Injunction

Plaintiffs seek to enjoin Defendants from any distribution, marketing, manufacture, sale, or offer for sale of any designs that are substantially similar to the Works.  Plaintiffs' Motion at 34–36.  To obtain a permanent injunction, a plaintiff must demonstrate the following: (1) that it suffered an irreparable injury; (2) that legal remedies, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, an equitable remedy is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).  Courts must consider these equitable factors, even after it has made a finding of copyright infringement. *Id.* at 392–93 ("[T]his Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." (citation omitted)).

11

1    The Court declines to rule on the request for an injunction, finding that the briefing and the

2    evidentiary record are not sufficient for the requisite analysis of the relevant factors.  Although

3    Plaintiffs point to evidence of Defendants' continued infringement, their only proffered evidence of

4    irreparable harm is testimony from Plaintiff Jean Royère SAS's own principals regarding

5    Defendants' rights to sell Jean Royère products.  *See* Plaintiffs' Reply at 10; PSUF ¶ 280

6    (referencing testimony by Plaintiffs Jean Royère SAS's CEO that clients "don't understand why

7    Edition Modern is selling Jean Royère products, if they don't have the rights").  This evidence,

8    standing alone, is insufficient for the Court to find that Plaintiffs suffered irreparable harm.  *See*

9    *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (noting that the plaintiffs had

10   not shown irreparable harm because it provided no evidence to support its assertions of reputational

11   damage); *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1169 (C.D. Cal. 2009) ("[B]y failing

12   to proffer evidence regarding [its brand's] penetration into the U.S. market, [the plaintiff] failed to

13   demonstrate that it has significant reputation or goodwill to protect in that market."); *cf. Apple Inc. v.*

14   *Psystar Corp.*, 673 F. Supp. 2d 943, 948–49 (N.D. Cal. 2009), *aff'd,* 658 F.3d 1150 (9th Cir. 2011)

15   (finding irreparable harm because the plaintiffs put forth significant and compelling evidence of the

16   impact of the defendants' infringement on the plaintiff's brand, business reputation, and goodwill).

17   In summary, the Court declines to rule on the present record but will entertain a standalone

18   motion for preliminary injunction that addresses in detail all of the factual and legal bases for the

19   relief requested.

20   **E.  Trademark Rights**

21   Next, Defendants move for summary judgment on Plaintiffs' trademark infringement claim

22   (Claim Four).  They contend that this claim fails because Defendant Edition Modern can establish its

23   priority of use of the JEAN ROYÈRE mark.  Defendants' Motion at 4.  Plaintiffs argue this

24   contention fails because Defendants cannot establish that the JEAN ROYÈRE trademark was

25   abandoned in the first place.  Plaintiffs' Opp. at 7–8.[5]

26

27   _____

      [5] The Court notes that abandonment is an affirmative defense that Defendants did not assert in their
      Answer.  *See* Defendants' Answer to Second Amended Complaint and Counterclaims [Dkt. No. 56].

28

1    To demonstrate priority of use, a defendant must prove (1) "that [it] actually adopted and

2 used the mark[] in commerce prior to [plaintiff's] registration in such a manner that sufficiently

3 associated the mark[] with [its use]" and (2) that its "use of the marks was continuous and not

4 interrupted." *Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc.*, 448

5 F.3d 1118, 1125–26 (9th Cir. 2006) (citations omitted).  A first use must be "bona fide and

6 commercial in character." *Id.*  "[T]he litigant attempting to establish priority of commercial use

7 must demonstrate both adoption of the mark[] and use in a way sufficiently public to identify or

8 distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of

9 the mark." *Id.* (citation omitted).  When assessing prior use in commerce, courts consider the totality

10 of the circumstances, including non-sales activity.  *Id.*

11    Defendants fail to establish the absence of a genuine dispute on this point.  The parties agree

12 that Plaintiff Jean Royère SAS registered the JEAN ROYÈRE mark on May 7, 2019.  DSUF ¶¶ 25,

13 109.  They dispute, however, whether this date is properly used as Plaintiffs' claimed priority date.

14 Defendants' Motion at 5; DSUF ¶¶ 17, 18.  Defendants point to invoices, price lists, and its website

15 to prove its continuous use of the JEAN ROYÈRE mark since at least 2016.  But such evidence does

16 not speak specifically to the scope of such use and consequently fails to establish Defendants' use of

17 the trademark in a "sufficiently public" manner.  *See Brookfield Commc'ns, Inc. v. W. Coast Ent.*

18 *Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999) (finding that use of a mark in e-mail correspondence

19 with lawyers and customers failed to meet the "sufficiently public" standard); *cf. id.* ("Marvel

20 Comics's announcements to 13 million comic book readers . . . or the mailing of 430,000 solicitation

21 letters with one's mark . . . may be sufficient to create an association among the public . . . ."

22 (citation omitted)); *see also Bazaar Del Mundo*, 448 F.3d at 1127 (concluding that the defendants'

23 brochures, without additional evidence of sales activity and extent of distribution, were insufficient

24 because they were not "designed to attract the attention of the viewer to the marks themselves"

25

26

27  Affirmative defenses are generally waived if they are not asserted in the answer to a complaint.  *In*
*re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008) (citing Fed. R. Civ. P. 8(c)).

28

1    (citation omitted)).  Defendants have not carried their burden to warrant summary judgment on this

2    claim.[6]

3              **F.  Trade Dress**

4              Defendants also move for partial summary judgment on the grounds that Plaintiffs cannot

5    prove their trade dress claim (Claim Seven).  To prove trade dress infringement, a plaintiff must

6    demonstrate that (1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary

7    meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and

8    defendant's products.  *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009)

9    (citation omitted).  Defendants argue that Plaintiffs cannot establish that their trade dress has

10   secondary meaning and therefore Claim Seven fails as a matter of law.  Defendants' Motion at 11–

11   21.

12             To demonstrate secondary meaning, a plaintiff must show that "a mental recognition in

13   buyers' and potential buyers' minds that products connected with the [mark] are associated with the

14   same source."  *Art Attacks Ink*, 581 F.3d at 1145 (citation omitted).  This can be established through

15   direct and circumstantial evidence, including, "direct consumer testimony; survey evidence;

16   exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales

17   and number of customers; established place in the market; and proof of intentional copying by the

18   defendant."  *Id.*; *Aurora World*, 719 F. Supp. 2d at 1151.  Evidence of extensive unsolicited media

19   coverage can indicate secondary meaning.  *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747,

20   754 (9th Cir. 2018) (citation omitted).  "[P]roof of copying strongly supports an inference of

21   secondary meaning."  *Id.* at 755.

22             Plaintiffs offer ample evidence of secondary meaning.  *See* Motion at 14–15.  In particular,

23   many of the articles of trade dress at issue have been featured in media as associated with Jean

24   Royère, by well-known sources such as Architectural Digest, Christie's, and Town and Country.

25

26   [6] Because Plaintiffs' remaining trademark and related claims—Claims Five (contributory trademark
     infringement), Six (vicarious trademark infringement), Eight (false designation of origin), and Nine
27   (unfair competition)—rely on or are similar to the trademark infringement claim (Claim Four),
     Defendants' Motion as to those claims is denied.  *See* Defendants' Motion at 9–11.
28

                                              14

1    *See, e.g.,* SUF ¶¶ 175 (Éléphanteau), 187 (Flaque), 215 (Liane), 230 (Oeuf), 250 (Ondulation

2    sconce), 266 (Ours Polaire Sofa), 303 (Trefle), and 329 (Sculpture).  They have also appeared in

3    books, web articles, and museum exhibits, all associated with Jean Royère.  *See, e.g.,* SUF ¶¶ 173–

4    178, 184–189.  And, as discussed above, *supra* Section IV.C., Plaintiffs have proven that Defendants

5    copied the Works, further supporting secondary meaning in their trade dress.  Consequently, since

6    Plaintiffs have presented sufficient evidence that a jury court find in its favor on its trade dress claim,

7    Defendants' Motion is denied as to Claim Seven.

8    **V.     CONCLUSION**

9           In conclusion, the Court finds that Defendants have infringed on Plaintiffs' copyright, but

10   that the record does not warrant a permanent injunction at this stage.  A genuine dispute of material

11   fact remains on the remaining trademark and trade dress claims.  For the foregoing reasons,

12   Plaintiffs' Motion for Partial Summary Judgment is granted, in part, and Defendants' Motion for

13   Partial Summary Judgment is denied.

14

15   Dated:    December 7, 2023

16                                                          _____
                                                            Hernán D. Vera
17                                                          United States District Judge

18

19

20

21

22

23

24

25

26

27

28